**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

QC MANAGEMENT, LLC,

Plaintiff,

v.

EGREEN TRANSPORT CORPORATION; and YI HSUAN WU a/k/a/ ANNIE WU,

Defendants.

CIVIL ACTION NO.: 4:24-cv-211

**ORDER**

Plaintiff QC Management, LLC, ("QCM") brought this action against Defendants Egreen Transport Corporation ("Egreen") and Yi Hsuan Wu a/k/a Annie Wu. (Doc. 27.) Plaintiff and Egreen entered an agreement through which Plaintiff would provide Egreen temporary staffing services in return for payment (the "Staffing Agreement"). (Id.) Wu, an employee and representative of Egreen, signed an agreement with Plaintiff through which Wu allegedly agreed to guarantee and be financially responsible for the sums incurred by Egreen under the Staffing Agreement (the "Guaranty Agreement"). (Id. at p. 3.) Plaintiff sued Defendants for breach of contract as to the Staffing Agreement and the Guaranty Agreement, breach of the duty of good faith and fair dealing, tortious/malicious interference with business relations, and unjust enrichment. (Id. at pp. 5–8.) There are two motions presently before the Court: (1) Plaintiff's (Corrected) Motion for Summary Judgment,[1] (doc. 56); and (2) Defendant Wu's Motion for Summary Judgment, (doc. 62). The motions are fully briefed. (See docs. 56, 62, 68, 72 & 76.)

[1] Plaintiff's Motion is styled as a "Motion for Summary Judgment," but it would be more appropriately titled "Motion for Partial Summary Judgment," because it does not seek summary judgment on all of Plaintiff's claims. (Doc. 56, p. 1.) Thus, the Court will from this point refer to Plaintiff's Motion as its "Motion for Partial Summary Judgment."

For the reasons below, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Partial Summary Judgment, (doc. 56), and **DENIES** Defendant Wu's Motion for Summary Judgment, (doc. 62).

**BACKGROUND**

## I. Factual Background

The Court derives the facts below from the parties' submissions and the summary judgment record.[2] (Docs. 27, 55, 56, 62, 68, 69, 72 & 76.) Under Local Rule 56.1, when a fact is undisputed, the Court includes the fact. For disputed facts, the Court reviews the record to determine whether a material dispute exists. If the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. And, where appropriate, the Court includes facts drawn from its review of the record. See Williams v. Wal-Mart Stores E., LP, 661 F. Supp. 3d 1264, 1266 (N.D. Ga. 2023). The following facts are undisputed unless otherwise stated.

### A. The Staffing Agreement

Plaintiff is engaged in the business of providing temporary staffing services. (Doc. 72-1, pp. 1–2.) Egreen is engaged in the business of freight transport services and third-party warehousing for e-commerce. (Id. at p. 2.) Egreen operates two warehouses in Savannah, Georgia (the "Warehouses"). (Id.) On January 19, 2024, Plaintiff and Egreen entered into the Staffing

[2] Plaintiff originally moved for summary judgment, (doc. 54), but then, on the same day, filed the at-issue Motion for Partial Summary Judgment, (doc. 56), and later moved to withdraw the initial filing, (doc. 65). The Court granted Plaintiff's motion to withdraw its original motion, and the Motion for Partial Summary Judgment remains pending. (Doc. 66.) In the Motion for Partial Summary Judgment, Plaintiff cites exhibits included in its original motion. The Court exercises its discretion in managing its docket to include the cited exhibits in Plaintiff's original motion for summary judgment, (doc. 55), in its review of the at-issue Motion for Partial Summary Judgment, (doc. 56).

Agreement, under which Plaintiff would provide temporary staffing services in return for payment for those services (the "Staffing Agreement"). (Id.; doc. 27-1.) Pursuant to Section 1.1.1 of the Staffing Agreement, Plaintiff agreed to recruit, screen, interview, and assign employees ("Assigned Employees") to work under Egreen's supervision at the Warehouses. (Doc. 72-1, p. 3; doc. 27-1, pp. 1, 4.) Also, under Section 1.1.2 of the Staffing Agreement, Plaintiff was to "[p]ay Assigned Employees' wages," and "[p]ay, withhold, and transmit payroll and income taxes." (Doc. 27-1, p. 1.) In exchange for Plaintiff's services, Section 3.1 of the Staffing Agreement provides that:

> [Egreen] will pay to [Plaintiff] for its performance at the rates set forth on Exhibit A and will also pay any additional costs or fees set forth in the [Staffing] Agreement[.] [Plaintiff] will invoice [Egreen] for services provided under this Agreement on a weekly basis. Payment is due **NET 45 days**. [Egreen] agrees to pay the costs of collection, including attorneys' fees and costs, if [Egreen] fails to pay amounts that are due and outstanding under this Agreement.

(Id. at p. 2.) Exhibit A in turn sets forth rates that Egreen was to pay Plaintiff for three categories of Assigned Employees. (Doc. 72-1, p. 3; doc. 27-1, p. 4.) For example, for "On site/Staffing Services" during first shift, Egreen agreed to pay a 35 percent markup, meaning it would pay Plaintiff the individual Assigned Employee's hourly wage plus 35 percent. (Doc. 72-1, pp. 3–4; doc. 27-1, p. 4.) Exhibit A further provides that "[f]ailure to pay in accordance with the payment terms set forth in the [Staffing] Agreement shall result in an automatic rate increase to 45% markup." (Doc. 27-1, p. 5.)

After entering the Staffing Agreement, Plaintiff began providing workers to Egreen pursuant to the Staffing Agreement's terms. (Doc. 72-1, pp. 4–5.) Egreen requested a specific number of Assigned Employees each week and Plaintiff invoiced Egreen weekly, providing separate rates for the three categories of Assigned Employees listed in Exhibit A. (Id.) Egreen paid some initial invoices early in the business relationship. (Id. at p. 5.) Then, between February

6, 2024, and April 3, 2024, Plaintiff sent 19 invoices to Egreen that went unpaid, totaling $304,784.24. (Id. at p. 6; doc. 27-3; doc. 27-4; doc. 27-5.) Eventually, in April 2024, Plaintiff stopped providing services to Egreen. (Doc. 72-1, pp. 7–8.) Plaintiff claims that the reason it discontinued its services was that "it became apparent that [Egreen] had no intention of making payment on past due invoices or paying for future invoices." (Id. at p. 7.) Egreen, on the other hand, claims that it "was not apparent to [Plaintiff] that Egreen was not paying," but rather, "[w]hat did become apparent to [Plaintiff] is that Egreen had issues with the invoices because [Plaintiff] unilaterally changed the agreed upon 45 [day] window for payment to periods much less." (Id. at p. 8.)

Plaintiff claims that it made "repeated efforts to have Egreen pay the amounts due," but that Egreen failed to make payment and "refused to communicate with [Plaintiff] at all between April 2024 and August 2024." (Id.) On May 6, 2024, Plaintiff sent Egreen two emails with a list of invoices with an accounts receivable report showing, according to Plaintiff, all amounts due and owing. (Id. at pp. 8–9; doc. 27-3; doc. 27-4.) The invoices provide for 30-day deadlines despite the 45-day deadline set out in the Staffing Agreement. (Doc. 27-3; doc. 27-4; see also doc. 27-5 (invoices stating payment terms as "Net 30").)

In an August 28, 2024, email, Egreen requested a "revised invoice" to reflect a change in the mark up from 35 percent to 26 percent because, Egreen argued in the email, the 35 percent markup is for a 45-day term, but the term Plaintiff gave on the invoices was 15 days, "and the market price for 15 days and 30 days markup is about 26 percent." (Doc. 55-10, p. 2; see also doc. 72-1, p. 10.) In the same email, Egreen also requested evidence that Plaintiff had properly paid all the Assigned Employees. (See doc. 55-10, p. 2.) Plaintiff responded to Egreen's email on August 29, and stated that Plaintiff "never agreed to a lower markup and will not lower the amounts due

at this time," and again requested "immediate payment of these overdue amounts." (Id. at p. 1.) On the same day, Egreen replied by reiterating its request for revised invoices with a 26 percent markup and for evidence that Plaintiff had properly paid all the Assigned Employees. (Id.)

As for Plaintiff's payment of Assigned Employees, Plaintiff claims that, before the unpaid invoices were sent, "the weekly payroll timesheets of the temporary employees whom QCM retained and supplied to Egreen were sent to Egreen for Egreen's approval," and that an "Egreen representative approved the timesheets by providing a physical or e-signature for each payroll that is reflected in the 19 invoices." (Doc. 72-1, p. 6; doc. 55-7, pp. 190–250.) Egreen, on the other hand, maintains that Plaintiff did not provide evidence "showing that the employees were actually paid for the alleged hours worked or that withholding for taxes and benefits was done proper[l]y pursuant to paragraph 1.1.2 of the Staffing Agreement[.]" (Doc. 72-1, pp. 6–7.) In this regard, Egreen contends that "[n]one of the handwritten timesheets [offered by Plaintiff as summary judgment evidence] have any notation from anyone employed or acting on behalf of Egreen." (Id. at p. 7; see doc. 55-7, pp. 190–250.) Egreen still has not paid amounts Plaintiff alleges total $304,784.24 due and owing to Plaintiff. (Doc. 72-1, pp. 5–6.) Plaintiff argues (and Egreen disputes) that the 45 percent markup penalty for nonpayment pursuant to Exhibit A of the Staffing Agreement yields damages of $327,360.85 (($304,784.24 / 1.35) x 1.45). (Doc. 56, p. 5; doc. 72-1, p. 13.)

**B. The Guaranty Agreement**

Defendant Wu was an employee of Egreen and handled communications with Plaintiff on behalf of Egreen. (Doc. 72-1, p. 15.) According to Plaintiff, "[o]n February 21, 2024, Wu signed [the] Guaranty Agreement with QCM under which she agreed to [g]uaranty and be financially responsible for the sums incurred by Egreen under the Staffing Agreement." (Id.) Defendant

Egreen denies this and maintains that the Guaranty Agreement "does not identify the Plaintiff or the Debtor." (Id.) The following image depicts the Guaranty Agreement's first paragraph:

> ***GUARANTY AGREEMENT***
>
> This Guaranty Agreement (this "Guaranty") is made effective as of January 31, 2024, by Annie Wu - Client Representative, (the "Guarantor") of Egreen Transport Corporation with locations at 102 Northwest Ct, Savannah, GA 31407 and 455 Jimmy Deloach Pkwy, Port Wentworth, GA 31407.
>
> This Guaranty is being given to Josey Crisostomo and Paul B Quiles, (the "Creditor") of QC Management, LLC.
>
> This Guaranty is being given for the benefit of the Guarantor and for ________________, (the "Debtor") of ________________, ________________, ________________ ________________.

(Doc. 27-2, p. 1; see also doc. 72-1, p. 15.) Section I of the Guaranty Agreement provides, in relevant part:

> If the Debtor should default in performance of its obligations under the contract according to the contract's terms and conditions, the Guarantor shall be liable to the Creditor for all expense, costs, and damages that the Creditor is entitled to recover from the Debtor, including, to the extent not prohibited by law, all costs and attorney's fees incurred in attempting to realize upon this Guaranty.

(Doc. 27-2, p. 1; see also doc. 72-1, p. 15.) The following image depicts the Guaranty Agreement's signature section:

> **XVI. SIGNATURES.** This Guaranty shall be signed for the Guarantor by Josey Crisostomo, Managing Director.
>
> DocuSigned by: Annie Wu – Client Representative
> By: Annie Wu - Client Representative Date: 2/21/2024
> (Debtor)
>
> DocuSigned by:
> By: ________________ Date: 2/22/2024
> Josey Crisostomo
> Managing Director
> QC Management, LLC
>
> DocuSigned by: Paul Quiles
> By: ________________ Date: 2/22/2024
> Paul B Quiles
> Managing Director
> QC Management, LLC

(Doc. 27-2, p. 2; see also doc. 72-1, pp. 15–16.)

The parties dispute whether the Guaranty Agreement identifies Plaintiff as the "Creditor" and/or any party as the "Debtor," and thus whether Wu is financially responsible for the sums Egreen incurred under the Staffing Agreement. (Doc. 72-1, pp. 15–16; doc. 69, pp. 2–3.) Specifically, both Egreen and Wu assert that the Guaranty Agreement "does not identify the Plaintiff or the Debtor," (doc. 72-1, p. 15; doc. 62, p. 3), and Wu argues that the Guaranty Agreement "was given to 'Josey Crisostomo and Paul B Quiles' defined as the Creditor," not Plaintiff. (Doc. 62, p. 2.) Plaintiff notes that Crisostomo and Quiles are identified in the Guaranty Agreement as "of QCM" and they both signed as managing directors of QCM. (Doc. 68, p. 2.)

## II. Procedural History

In its Second Amended Complaint (which is the current operative version of the complaint), Plaintiff asserts claims for breach of contract as to the Staffing Agreement (Count I); breach of the duty of good faith and fair dealing (Count II); breach of contract as to the Guaranty Agreement (Count III); tortious/malicious interference with business relations (Count IV); and unjust enrichment (Count V). (Doc. 27, pp. 5–8.) The crux of Plaintiff's claims is that Egreen failed to pay Plaintiff for staffing agency services rendered between January and April of 2024. (Id. at p. 3; doc. 56, p. 1.) Plaintiff seeks to recover $304,784.24, as well as interest, penalties, and attorneys' fees and costs. (Doc. 27, pp. 8–9; doc. 56, p. 1.)

Plaintiff moved for partial summary judgment, requesting summary judgment in its favor on three of its five claims: Count I for breach of the Staffing Agreement; Count III for breach of the Guaranty Agreement; and Count V for unjust enrichment. (Doc. 56, p. 1 n.1.) Defendant Egreen filed a Response, (doc. 72), and Plaintiff filed a Reply, (doc. 76). Defendant Wu, on the other hand, filed her own Motion for Summary Judgment arguing the Court should dismiss the

sole claim against her—Count III for breach of the Guaranty Agreement. (Doc. 62.) Plaintiff filed a Response. (Doc. 68.)

**LEGAL STANDARD**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable

to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted). Additionally, the Court is not permitted to make credibility determinations, weigh conflicting evidence to resolve disputed facts, or assess the quality of the evidence. Reese v. Herbert, 527 F.3d 1253, 1271 (11th Cir. 2008).

## DISCUSSION

### I. Choice of Law

The Court must first determine the law that governs this dispute. In this diversity action, the Court must apply the choice-of-law rules of its forum state of Georgia to determine which state's substantive laws apply. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir. 1998) (citing Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 487 (1941)). There are two contracts at issue. First, the Guaranty Agreement contains a choice-of-law provision specifying that it "shall be governed by the laws of the State of Florida." (Doc. 27-2, p. 2.) Georgia courts generally enforce choice-of-law provisions unless the application would contravene public policy. See Becham v. Synthes USA, 482 F. App'x 387, 390–91 (11th Cir. 2012) (per curiam). The Court has not identified a public policy that would preclude enforcement of the Guaranty Agreement's choice-of-law clause. Plaintiff's breach-of-contract claim as to the Guaranty Agreement is thus governed, in accordance with its terms, by Florida law.

The Staffing Agreement, on the other hand, does not contain a choice-of-law provision. (See generally doc. 27-1.) To decide which state's laws apply to the interpretation of a contract that "contains no choice of law provision, Georgia applies the rule of lex loci contractus." Lima Delta Co. v. Glob. RI-022 Aerospace, Inc., 789 S.E.2d 230, 235 (Ga. Ct. App. 2016) (internal quotations and citation omitted). Under this rule, "contracts 'are governed as to their nature, validity and interpretation by the law of the place where they were made' unless the contract is to be performed in a state other than that in which it was made." Boardman Petroleum, 135 F.3d at 752 (quoting Gen. Tel. Co. of Se. v. Trimm, 311 S.E.2d 460, 461 (Ga. 1984)). In this case, it is unclear where the Staffing Agreement was made, but it is clear that the agreement was to be performed in Georgia. (Doc. 72-1, pp. 2–3 (Staffing Agreement set out that Plaintiff would provide staff for Egreen's Georgia Warehouses); see also doc. 27-1.) The parties also appear to agree that Georgia law governs the Staffing Agreement, as they only cite Georgia case law on this issue. (See doc. 56, pp. 6–10; doc. 72, pp. 11–20; doc. 76, pp. 3–8.) Accordingly, the Court applies Georgia law with regard to the Staffing Agreement.

## II. Breach of the Staffing Agreement (Count I) and Unjust Enrichment (Count V)

The elements for a breach of contract claim in Georgia are "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Knaack v. Henley Park Homeowners Ass'n, Inc., 877 S.E.2d 821, 829 (Ga. Ct. App. 2022) (quoting McAlister v. Clifton, 873 S.E.2d 178, 183 (Ga. 2022)). The Court thus analyzes whether Egreen materially breached the Staffing Agreement and whether damages arose from the alleged breach.

**A. Whether Egreen Materially Breached the Staffing Agreement**

Plaintiff argues that Egreen breached the Staffing Agreement because Egreen accepted services under the Staffing Agreement and has not paid for the services. (Doc. 56, pp. 6–7.) It is undisputed that Plaintiff provided Egreen staffing services valued at $304,784.24 under the rates set out in Exhibit A of the Staffing Agreement, that Plaintiff sent Egreen 19 invoices requesting payment, and that Egreen has not paid those 19 invoices. (Doc. 72-1, pp. 4–6.) "While any diversion from contractual obligations may be considered a breach, a material breach only occurs when the failure to perform is so fundamental it goes to the root or essence of the contract and defeats its central purpose." Clower v. Orthalliance, Inc., 337 F. Supp. 2d 1322, 1333 (N.D. Ga. 2004) (citing Lager's LLC v. Palace Laundry, Inc., 543 S.E.2d 773, 776 (Ga. Ct. App. 2000)). The central purpose of the Staffing Agreement was the provision of temporary staffing services in return for payment for those services. (Doc. 72-1, p. 2.) Egreen's failure to pay the 19 outstanding invoices indeed goes to the essence of the contract and defeats its central purpose and thus constitutes a material breach.

However, Egreen contends that Plaintiff is not entitled to summary judgment because Plaintiff has "failed to meet its initial burden" of proving each element of its breach of contract claim, specifically because Plaintiff cannot show that it performed its obligations under Section 1.1.2. of the Staffing Agreement.[3] (Doc. 72, pp. 7–10.) Egreen argues that Plaintiff is "required to prove that it performed or substantially performed each and every clause under the Staffing Agreement," and Plaintiff's "failure to point to the record where there is evidence showing that it complied with its obligations under [Section] 1.1.2 constitutes a failure to satisfy its initial burden for summary judgment under Fed. R. Civ. P. 56." (Id. at p. 10.)

[3] Section 1.1.2 was the provision stating that Plaintiff would "[p]ay Assigned Employees' wages," and "[p]ay, withhold, and transmit payroll and income taxes." (Doc. 27-1, p. 1.)

As Plaintiff notes in its Reply, "Egreen fails to cite a single case to support this bold assertion." (Doc. 76, p. 3.) Plaintiff need not show strict compliance with every facet of the Staffing Agreement. The "general rule with respect to compliance with contract terms is not strict compliance, but substantial compliance." Dennard v. Freeport Mins. Co., 297 S.E.2d 222, 225 (Ga. 1982). Georgia law expressly recognizes that performance "must be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time" to be effective. O.C.G.A. § 13-4-20. The undisputed facts show that Plaintiff provided the contracted-for labor and rendered invoices reflecting the amounts due. (Doc. 72-1, pp. 4–6.) These facts establish that Plaintiff has substantially complied with the terms of the Staffing Agreement. Accordingly, Egreen's argument that Plaintiff is required to show that it performed its obligations under Section 1.1.2 of the Staffing Agreement to be entitled to summary judgment fails.

Egreen further argues that it is excused from performance under the Staffing Agreement because Plaintiff breached two "critical provisions" of the Agreement: Section 3.1 regarding payment terms; and Section 1.1.2 regarding the payment of Assigned Employees' wages. (Doc. 72, pp. 7–15, 19; see also doc. 27-1, pp 1–2.) Egreen also argues that the 45 percent markup outlined in Exhibit A of the Staffing Agreement is an unenforceable penalty under Georgia law. (Doc. 72, pp. 15–20; doc. 27-1, p. 4.) The Court addresses each issue in turn.

**(1) Section 3.1 (Payment Terms)**

Plaintiff argues that Egreen is in default under Section 3.1 of the Staffing Agreement because "Egreen agreed to pay invoices on a NET 45 basis, meaning payment was due within 45 days of invoicing," and Egreen has failed to remit payment. (Doc. 56, pp. 2–3.) Egreen admits that the Staffing Agreement provides for a "NET 45" deadline for payment but argues that Plaintiff unilaterally changed the contractual payment deadline from 45 days to 30 days, constituting a

breach, thereby excusing Egreen from performance under the Staffing Agreement. (Doc. 72, p. 12.) Egreen also argues that Plaintiff, by "imposing different terms and conditions regarding payment[,] made performance by Egreen impossible." (Id. at p. 11.) Indeed, the 19 invoices in question contain due dates for 30 days after the invoices were issued. (Doc. 27-3, p. 1; doc. 27-5; doc. 55-6, pp. 47–75.) Plaintiff admits that one of its 30(b)(6) representatives, Jennifer Aragon, testified that while the first few invoices contained a 45-day payment structure, Plaintiff began sending invoices with shorter, 30-day deadlines because Egreen "never paid within the 45 days." (Doc. 56, pp. 7–8; doc. 55-7, pp. 13–14.)

Under Georgia law, "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." O.C.G.A. § 13-4-23. A party's obligation to perform may be relieved "where the other party to the contract repudiates the obligation by act or word, or takes a position which renders performance of the obligation useless or impossible." J & E Builders, Inc. v. R C Dev., Inc., 646 S.E.2d 299, 301 (Ga. Ct. App. 2007) (quoting Taliafaro, Inc. v. Rose, 469 S.E.2d 246, 247–48 (Ga. Ct. App. 1996)). Egreen's defenses: (1) that it was excused from performance because Plaintiff materially breached the Staffing Agreement; and (2) that Plaintiff's conduct made Egreen's performance impossible, both fail.

Plaintiff's alteration of the 45-day deadline did not excuse Egreen from paying the invoices because the breach was not material, and even if the breach were material, Egreen waived its ability to argue that the breach excused it from performing by continuing to accept the staffing services after Plaintiff's alleged breach. As Plaintiff points out, the Staffing Agreement "contains no language suggesting that requesting earlier payment would constitute a breach of the agreement." (Doc. 56, p. 8 (citing doc. 27-1).) Moreover, "[a] material breach only occurs when the failure to

perform is so fundamental it goes to the root or essence of the contract and defeats its central purpose." Clower, 337 F. Supp. 2d at 1333. There is no genuine issue of material fact as to whether Plaintiff materially breached the agreement by changing the payment deadlines from 45 days to 30 days because such change does not go to "the root or essence of the contract" or "defeat[] its central purpose." Id. Egreen's allegations are at most "evidence of a breach which was incidental to the purpose of the contract." Lager's, 543 S.E.2d at 776.

Moreover, even if Plaintiff materially breached the agreement by changing the payment deadlines, Egreen waived its ability to argue that the breach excused it from performing by continuing to accept the staffing services after Plaintiff's alleged breach,. Clower, 337 F. Supp. 2d at 1333 ("In opting to continue the contract and receive benefits under that contract, the non-breaching party has ended its right to refuse to perform his part of the contract.").

Egreen does not argue that Plaintiff repudiated its obligations under the Staffing Agreement; thus, to constitute a defense to this action, Egreen's nonperformance must have been caused by conduct of Plaintiff that rendered Egreen's performance "useless or impossible." See J & E Builders, 646 S.E.2d at 301. Egreen claims that Plaintiff made performance by Plaintiff impossible by "imposing different terms and conditions regarding payment." (Doc. 72, p. 11.) According to Egreen, the "very purpose of [Section 3.1] was to allow Egreen time to bill its customers, obtain payment from its customers within a month and have time to pay the payroll," and a "shorter period would drastically affect Egreen's cash flow." (Id. at p. 12.) Yet, regardless of the extra-contractual 30-day deadline, Egreen still failed to meet the payment deadlines on the 19 unpaid invoices as stated in the contract (as it did not complete payment on any of those invoices within 45 days). Egreen's evidence fails to create a genuine issue of fact as to whether Plaintiff's shortening of the payment deadline made Egreen's payment impossible or useless.

Put simply, Plaintiff's change of payment terms does not excuse Egreen's failure to meet its contractual obligations. Even construing all facts in favor of Egreen, Plaintiff's change of terms did not materially breach the Agreement, nor did it render Egreen's performance impossible. Accordingly, Plaintiff's change of payment terms does not prevent Plaintiff from obtaining summary judgment.

**(2) Section 1.1.2 (Payment of Assigned Employees' Wages)**

Next, Egreen argues that it is excused from performance under the Staffing Agreement because Plaintiff breached Section 1.1.2 by failing and refusing to provide evidence or otherwise confirm that Plaintiff had properly paid all the workers. (Doc. 72, pp. 11–15.) Egreen contends that Section 1.1.2 "is central to the agreement because if the Plaintiff failed to withhold taxes and fringe benefits or paid the employees improperly, Egreen was on the hook for all the payments to taxing authorities and other payees." (Id. at p. 13.) In response, Plaintiff argues that Section 1.1.2 "does ***not*** state that [Plaintiff] must provide documentary proof [of compliance with Section 1.1.2] before Egreen's obligation to pay is triggered." (Doc. 76, p. 2 (citing doc. 27-1).) The central purpose of the Staffing Agreement was the provision of temporary staffing services in return for payment of those services. (Doc. 72-1, p. 2.) Plaintiff's alleged failure to provide Egreen proof that it complied with Section 1.1.2 does not go to "the root or essence of the contract" or "defeat[] its central purpose," and it is thus not a material breach. Id. Further, even if such conduct were a material breach, Egreen waived its ability to argue that the breach excused it from performing by continuing to accept the staffing services after Plaintiff's alleged breach. Clower, 337 F. Supp. 2d at 1333.

In sum, Plaintiff's disputed performance of the requirements set out in Section 1.1.2 is not a material breach of the Staffing Agreement, and Egreen was not excused from performance on this basis.

**B. Whether Damages Arose from the Breach**

As to the third element—whether damages arose from the breach—it is undisputed that Plaintiff provided staffing services to Egreen and sent invoices for those services, but Egreen has never paid. Accordingly, there is no material dispute of fact related to whether Egreen breached the Staffing Agreement.

For all these reasons, the Court **GRANTS** summary judgment for Plaintiff as to Egreen's liability for breach of contract (Count I).[4] (Doc. 56.)

**C. Extent of Damages Owed to Plaintiff**

In the Motion for Partial Summary Judgment, Plaintiff asserted that, as result of Egreen's breach, it is entitled to recover "the base amount of $304,784.24 plus the 45 percent penalty for non-payment pursuant to Exhibit A of the Staffing Agreement, yielding a judgment amount of $327,360.85 ($304,784.24 / 1.35 x 1.45)" plus the amount of "attorneys' fees incurred by Plaintiff through the briefing of th[e] summary judgment motion . . . pursuant to § 3.1 of the Staffing Agreement." (Doc. 56, p. 12.) While Egreen has disputed its obligation to pay *any* amount (because, it claims, it did not breach the contract), neither Defendant has disputed the accuracy of

[4] Plaintiff brings its claim for unjust enrichment (Count V) "in the event [it] is not compensated, for any reason, under the other counts in th[e] Second Amended Complaint[.]" (Doc. 27, p. 8.) Because Plaintiff is entitled to summary judgment on Count I, the Court **DISMISSES as moot** Count V, Plaintiff's claim for unjust enrichment. See Reynolds v. CB&T, 805 S.E.2d 472, 478–79 (Ga. Ct. App. 2017) ("[I]f a factfinder concludes that [defendant] is liable on [plaintiff's] breach of contract [claim], the issue of [defendant's] liability under the alternative [claim] of unjust enrichment . . . would become moot." (quoting Campbell v. Ailion, 790 S.E.2d 68, 74 (Ga. Ct. App. 2016))).

Plaintiff's claim that Egreen has a total of $304,784.24 in unpaid invoices for Plaintiff's services. The Court thus turns to the additional sums Plaintiff seeks to add to its breach of contract award.

**(1) Whether the 45 Percent Markup is a Penalty**

Section 3.1 of the Staffing Agreement provides that Egreen will pay Plaintiff at the rates set forth on Exhibit A. (Doc. 27-1, p. 2.) Exhibit A in turn outlines the rates at which specific Assigned Employee positions are billed and provides that "[f]ailure to pay in accordance with the payment terms set forth in the [Staffing] Agreement shall result in an automatic rate increase to 45[] percent markup." (Id. at p. 4.) Plaintiff argues (and Egreen disputes) that the "45 percent penalty for non-payment pursuant to Exhibit A of the Staffing Agreement, yields [total] damages in the amount of $327,360.85." (Doc. 72-1, p. 13; see also doc. 56, p. 7.) Egreen argues that the 45 percent markup outlined in Exhibit A of the Staffing Agreement is an unenforceable penalty under Georgia law. (Doc. 72, pp. 15–20.)

For a late fee to be considered an "enforceable liquidated damage provision, rather than a penalty, it must comply with three requirements." Telescripps Cable Co. v. Welsh, 542 S.E.2d 640, 642 (Ga. Ct. App. 2000). "First, the injury caused by the breach must be difficult or impossible of accurate estimation; second, the parties must intend to provide for damages rather than for a penalty; and third, the sum stipulated must be a reasonable pre-estimate of the probable loss." Se. Land Fund, Inc. v. Real Est. World, Inc., 227 S.E.2d 340, 343 (Ga. 1976) (internal quotations and citations omitted). "[W]here a designated sum is inserted into a contract for the purpose of deterring one or both of the parties from breaching it, it is [a] penalty." Daniels v. Johnson, 381 S.E.2d 87, 89 (Ga. Ct. App. 1989) (quoting Florence Wagon Works v. Salmon, 68 S.E. 866, 866 (Ga. Ct. App. 1910)).

The party who defaults on the contract has the burden of proving the liquidated damages clause is an unenforceable penalty. Liberty Life Ins. Co. v. Thomas B. Hartley Constr. Co., 375 S.E.2d 222, 223 (Ga. 1989). A defaulting party can carry this burden by proving any of the three factors is lacking. Caincare, Inc. v. Ellison, 612 S.E.2d 47, 50 (Ga. Ct. App. 2005). "The enforceability of a liquidated damages provision in a contract is a question of law for the court which necessarily requires the resolution of questions of fact." Maz Medics v. Satellite Advert. Sys., 391 S.E.2d 446, 446 (Ga. Ct. App. 1990) (alterations adopted) (quoting Liberty Life, 375 S.E.2d at 223). "[I]n cases of doubt the courts favor the construction which holds the stipulated sum to be a penalty and limits the recovery to the amount of damage actually shown, rather than a liquidation of the damages." Fortune Bridge Co. v. Dep't of Transp., 250 S.E.2d 401, 402 (Ga. 1978) (quoting Mayor &c. of Brunswick v. Aetna Indem. Co., 62 S.E. 475, 478 (Ga. Ct. App. 1908)).

Egreen contends that the Staffing Agreement "satisfied none of the three required criteria." (Doc. 72, p. 16.) According to Egreen, "[t]here is nothing in the Staffing Agreement to indicate the injury for late payment is difficult to estimate," there is "no evidence that the parties intended the 45% clause to provide for damages," and "the penalty is far in excess of what the Plaintiff could reasonabl[y] recover in interest for a late payment." (Id.) The Court agrees with Egreen's assertion that the injury caused by the breach was not difficult or impossible to accurately estimate. Moreover, Plaintiff does not dispute this assertion, and in fact, Plaintiff states that the 45 percent markup "would simply raise the balance due from $304,784.24 to $327,360.85." (Doc. 76, p. 7.) Exhibit A also fails the second element, that the parties must have intended to provide for damages rather than for a penalty. Plaintiff itself refers to the provision as a "penalty" throughout its own Motion for Partial Summary Judgment. (Doc. 56, pp. 5, 7, 12.) Further, QCM managing director,

Josey Crisostomo, testified that the 45 percent markup is a "a penalty for failure to pay." (Doc. 55-8, p. 16.) Accordingly, Exhibit A of the Staffing Agreement constitutes an unenforceable penalty, and Plaintiff's recovery for the breach of contract claim asserted in Count I shall be limited to the amount of damages proven, rather than a liquidation of the damages. Therefore, the Court **DENIES** Plaintiff's Motion for Summary Judgment on the liquidated damages clause.

**(2) Whether Plaintiff is Entitled to Recover Attorneys' Fees Incurred "through" the Briefing of the Partial Summary Judgment Motion**

In the Motion, Plaintiff asserts its entitlement, under Section 3.1 of the Staffing Agreement, to "pay[ment of] the costs of collection, including attorney's fees and costs." (Doc. 56, p. 4.) Specifically, Plaintiff moves the Court, "upon granting summary judgment in this matter . . . [to] further allow the undersigned counsel to provide an accounting of attorneys' fees incurred by Plaintiff through the briefing of this summary judgment motion and that such amount be added to the judgment as a proper award of attorneys' fees pursuant to § 3.1 of the Staffing Agreement." (Id. at p. 12.) Unlike Plaintiff's claimed entitlement to the 45 percent markup, which Egreen vehemently opposed through several pages of argument in its response brief, Egreen's response brief does not mention—much less object to—Plaintiff's claimed entitlement, under Section 3.1, to attorneys' fees incurred during this lawsuit. (See doc. 72.) There being no dispute over the applicability of the attorneys' fees provision, the Court finds that Plaintiff's damages for the breach of the Staffing Agreement may include reasonable attorneys' fees incurred as part of "the costs of collection" of the unpaid invoices. Given that this lawsuit includes claims that are not for the collection of the unpaid invoices (i.e., "tortious/malicious interference with business relations" and "breach of the duty of good faith and fair dealing"), the Court will not rubber-stamp an award of fees for *all* of counsel's time spent on this case.

In sum, there is no genuine material dispute that Plaintiff is entitled, under the Staffing Agreement, to the base amount of unpaid invoices ($304,784.24) as well as reasonable attorneys' fees incurred in the collection of the unpaid invoices. A briefing schedule for the attorneys' fees award is set forth in the Conclusion Section, infra.

**III. Breach of the Guaranty Agreement (Count III)**

A guaranty is a promise to pay the debt of another upon the default of the person primarily liable for payment or performance. Fort Plantation Invs., LLC v. Ironstone Bank, 85 So. 3d 1169, 1171 (Fla. 5th DCA 2012) (citing New Holland, Inc. v. Trunk, 579 So. 2d 215, 216–17 (Fla. 5th DCA 1991)). In essence, a guaranty "is a collateral promise to answer for the debt or obligation of another." Fed. Deposit Ins. Corp. v. Univ. Anclote, Inc., 764 F.2d 804, 806 (11th Cir. 1985) (citing Nicolaysen v. Flato, 204 So. 2d 547, 549 (Fla. 4th DCA 1967)). Under Florida law, the rules applicable to contracts generally also apply to guaranty contracts. Warner v. Caldwell, 354 So. 2d 91, 96 (Fla. 3d DCA 1977). To prevail in a breach of contract action under Florida law, a plaintiff must prove: (1) the existence of a valid contract; (2) a material breach of that contract; and (3) damages flowing from the breach. Deauville Hotel Mgmt., LLC v. Ward, 219 So. 3d 949, 953 (Fla. 3d DCA 2017). Here, Wu challenges Plaintiff's ability to prove the first element, arguing in her Motion for Summary Judgment that Count III should be dismissed because the Guaranty Agreement is not a valid contract. (Doc. 62, pp. 2–3.) "Issues of contract interpretation are generally questions of law and, thus, properly resolved on summary judgment," but "the existence of a contract is a question of fact to be determined by consideration of all the facts and circumstances." Lockheed Martin Corp. v. Galaxis USA, Ltd., 222 F. Supp. 2d 1315, 1323–24 (M.D. Fla. 2002) (first citing Laws. Title Ins. Corp. v. JDC (Am.) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995); then citing Master Palletizer Sys., Inc. v. T.S. Ragsdale Co., 725 F. Supp. 1525, 1531

(D. Colo. 1989); and then citing Green v. City of Hamilton, Hous. Auth., 937 F.2d 1561, 1566 (11th Cir. 1991)).

Florida's Statute of Frauds requires a guaranty to be in writing and signed by the guarantor. Fla. Stat. § 725.01. The "writing" must contain "language indicating that it was intended to be a personal guarantee [sic] under Florida law." Schmidt v. Sabow, 331 So. 3d 781, 788 (Fla. 2d DCA 2021). The writing must also contain the essential terms of the transaction, but several writings may be aggregated to satisfy the statute, even if only one of them is signed, provided the signed document expressly or implicitly refers to the others. Provident Bank v. Taylor Creek Enters., LLC, No. 3:09-cv-36-MCR/EMT, 2010 WL 298300, at *2 (N.D. Fla. Jan. 19, 2010). "Such an implied reference may be established by either the fact that the documents relate to the same subject matter or by physical annexation." Id. (quoting Kolski ex rel. Kolski v. Kolski, 731 So.2d 169, 172(Fla. Dist. Ct. App. 1999)) (internal quotations omitted) (alterations adopted). The extent of the guarantor's liability depends on the language of the guaranty itself and is usually equal to that of the principal debtor. Fed. Deposit Ins. Corp., 764 F.2d at 806 (citing 38 Am. Jur. 2d Guaranty § 74 (1968)). "A guarantor is liable only in the event and to the extent that his principal is liable." Id. (quoting 38 Am. Jur. 2d Guaranty § 77 (1968)).

Plaintiff argues that it is entitled to summary judgment against Wu as to Count III because "the record evidence shows (1) that Defendant Wu signed the Guaranty Agreement; (2) that she understood that in doing so she was assuming certain liability for Egreen; and (3) that Egreen has defaulted under the Staffing Agreement." (Doc. 56, p. 11.) Plaintiff alleges that "Wu's failure to pay the amounts owed by QCM is a breach of the Guaranty Agreement." (Doc. 27, p. 7.) Wu, on the other hand, argues in her own Motion for Summary Judgment that she is entitled to judgment dismissing Count III because the Guaranty Agreement does not identify Plaintiff as the "Creditor"

or any party as the "Debtor" and thus, Wu avers, the "Guaranty Agreement does not apply here" and "[t]here is no claim." (Doc. 62, pp. 2–3.) Wu also claims that she cannot be held personally liable for the Guaranty because she signed the Guaranty Agreement as a "client representative" rather than in her individual capacity. (Id. at p. 2 (citing doc. 27-2).)

Wu signed the Guaranty Agreement on a space labeled for signature "By: Annie Wu—Client Representative." (Id. at p. 2; see also doc. 29, pp. 2–3.) To be sure, such signatures, preceded by the word "by" and accompanied by *descriptio personae*—that is, language identifying the person signing the document as a corporate officer or something similar—seldom create personal liability for the person signing a contract to which she is not a specified party. Robert C. Malt & Co., 763 So. 2d at 510 (citing Delta Air Lines, Inc. v. Wilson, 210 So.2d 761, 763 (Fla. 3d DCA 1968)). That said, personal liability may still be imposed on *descriptio personae* signors where the contract otherwise contains language showing the creation of such liability. Id.; see ASD Specialty Healthcare, Inc. v. Jupiter Hematology & Oncology Assocs., P.A., No. 10-80534-CIV, 2010 WL 11596318, at *3 (S.D. Fla. Oct. 1, 2010), report and recommendation adopted, No. 10-80534-CIV, 2010 WL 11596319 (S.D. Fla. Oct. 20, 2010) ("Rather than relying on formulaic descriptions of the signor, Florida courts examine the meaning and intent of the entire contract in order to determine whether a signor has agreed to be personally liable."); see also Lab'y Corp. of Am. v. McKown, 829 So. 2d 311, 313 (Fla. 5th DCA 2002) ("Florida courts have consistently adhered to the general rule that an individual who executes a guarant[y] as an officer of a corporation by inserting his or her corporate title after their name on the document cannot defeat the purpose of the guarant[y] when, by its terms, the document contains provisions for individual liability.") "Corporations and persons cannot guarantee their own debts," and thus courts "will not construe as guaranties documents signed on behalf of the corporation already involved because

to do so would render the guaranty a nullity and meaningless." Pial Holdings, LTD v. Riverfront Plaza, LLC, 379 So. 3d 547, 551–52 (Fla. 6th DCA 2024); see also, e.g., Tampa Bay Econ. Dev. Corp. v. Edman, 598 So. 2d 172, 174 (Fla. 2d DCA 1992) ("For a corporation to guarantee its own debt would add nothing to its existing obligation and would be meaningless."); Robert C. Malt & Co., 763 So. 2d at 510 ("[I]t does not make sense for the corporation to guarantee its own debt.").

While Wu may be held personally liable despite signing the Guaranty Agreement as "Annie Wu—Client Representative," a genuine issue of material fact exists as to whether Wu understood that in signing the Agreement she was assuming certain liability for Egreen under the Staffing Agreement. Plaintiff argues that "there is no dispute that the Guaranty was intended to guarantee the debt incurred by Egreen Transport Corporation, and owed to Plaintiff, for services rendered pursuant to the Staffing Agreement." (Doc. 68, p. 3.) The Guaranty Agreement provides that: "If the Debtor should default in performance of its obligations under the contract according to the contract's terms and conditions, the Guarantor shall be liable to the Creditor for all expenses, costs, and damages that Creditor is entitled to recover from the Debtor[.]" (Doc. 27-2, p. 1.) But—notably—the Guaranty Agreement does not identify the "Debtor," and does not make clear what the "contract" is that it refers to, or what the debt is that Wu allegedly agreed to be liable for. (Id. at pp. 1–2.) As depicted in the Background Section I.B, supra, the space provided to identify the "Debtor" is left blank, and the signature block refers to Wu as "Debtor." (Id.) The Guaranty Agreement states that "a copy of the proposed contract is attached at Exhibit A," and it also states that the Agreement is "secured by" a "Pledge Agreement dated January 23, 2024." (Id. at pp. 1–2.) But the Guaranty Agreement in the record does not include an "Exhibit A" or any other attachments, and the parties have not provided evidence of such a Pledge Agreement. Plaintiff has not presented any evidence indicating that the Staffing Agreement was attached to the Guaranty

Agreement. The Staffing Agreement is dated January 19, 2024, and does not expressly or explicitly refer to the Guaranty Agreement. (Doc. 27-1, p. 3.) Further, the writing in the Guaranty Agreement does not make clear that it "relates to the same subject matter" as the Staffing Agreement. Provident Bank, 2010 WL 298300, at *2. Moreover, the Guaranty Agreement provides that the "Guaranty is being given to Josey Crisostomo and Paul B Quiles, (the 'Creditor') of QC Management, LLC" but does not clearly identify Plaintiff as the "Creditor." (Doc. 27-2, p. 1.)

For these reasons, genuine issues of material fact exist as to whether the Guaranty Agreement guarantees performance under the Staffing Agreement, and as to whether Wu understood that in signing the Guaranty Agreement, she assumed certain liability for Egreen under the Staffing Agreement. Accordingly, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment as to Count III, (doc. 56), and **DENIES** Wu's Motion for Summary Judgment, (doc. 62).

## CONCLUSION

For the above reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Partial Summary Judgment. (Doc. 56.) The Court **GRANTS** Plaintiff's Motion as to Count I but **DENIES** Plaintiff's Motion to the extent that it seeks to recover the 45 percent penalty prayed for. (Id.; see doc. 27, p. 5.) Plaintiff thus is entitled to recover the "base amount" owed for the unpaid services ($304,784.24) rather than the larger amount with the added penalty ($327,360.85), which it sought in its Motion. Because Plaintiff is entitled to summary judgment on Count I, the Court **DISMISSES as moot** Count V, Plaintiff's claim for unjust enrichment. The Court **DENIES** Plaintiff's Motion as to Count III. The Court likewise **DENIES** Defendant Wu's Motion for Summary Judgment (on Count III). (Doc. 62.) In addition to Count III, Plaintiff's claims against

Egreen for breach of the duty of good faith and fair dealing (Count II) and for tortious/malicious interference with business relations (Count IV) remain also pending. (Doc. 27.)

The Court **DIRECTS** Plaintiff to file, within **twenty-one (21) days** of the date of this Order, a detailed specification and itemization of the attorneys' fees to which it claims it is entitled pursuant to Section 3.1 of the Staffing Agreement, with appropriate affidavits and any other supporting documentation. Should Defendants wish to respond to Plaintiff's filing, they may do so within **fourteen (14) days** from the date of Plaintiff's filing.

**SO ORDERED**, this 9th day of September, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA